189 So.2d 430 (1966)
WHITNEY NATIONAL BANK IN JEFFERSON PARISH et al.
v.
A. Clayton JAMES, State Bank Commissioner of the State of Louisiana.
No. 6745.
Court of Appeal of Louisiana, First Circuit.
June 13, 1966.
Rehearing Denied July 8, 1966.
Writ Refused November 7, 1966.
*432 Malcolm L. Monroe, of Monroe & Lemann, Walter J. Suthon, III, Jerry A. Brown, New Orleans, for appellants.
Joseph H. Kavanaugh, Asst. Atty. Gen., Baton Rouge, A. J. Waechter, Jr., of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Bean & Rush, Lafayette, G. Harrison Scott, Sessions, Fishman, Rosenson & Snellings, New Orleans, Edward L. Merrigan, Washington, D. C., for appellee.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.[*]
LANDRY, Judge.
This is an action for a declaratory judgment by Whitney National Bank in Jefferson Parish (Whitney-Jefferson) and Whitney Holding Corporation (Whitney-Holding) against defendant A. Clayton James, State Bank Commissioner of the State of Louisiana (Commissioner), seeking an adjudication holding that the provisions of Act 275 of 1962, LSA-R.S. 6:1001-6:1006, inclusive, known as the Bank Holding Company Act, which prohibits a bank holding corporation from opening any place of business not actually open on the effective date of the statute, is inapplicable to Whitney-Jefferson, and, alternatively, that its application to Whitney-Jefferson is unconstitutional. From the judgment of the trial court holding that the statute in question is directly applicable to petitioner Whitney-Jefferson and bars said plaintiff's opening for business and also decreeing the law constitutional, plaintiffs Whitney-Jefferson and Whitney-Holding have appealed.
The declaration of public policy to be served by the aforementioned Bank Holding Company Act is contained in Section 1001 which reads as follows:
"§ 1001. Declaration of policy
"It is declared to be the policy of this state to protect and to foster the growth of the independent unit bank, and institution whose ownership and origins are grounded in the local community and whose activities are bound up with local economic and social organizations; to prevent the undesirable concentration of control in the banking field to the detriment of the public interest; to insure effective competition among all banking institutions; and, to accomplish these objectives by prohibiting the formation of new banking holding companies and the acquisition of control by whatever means of additional banking institutions by existing *433 bank holding companies and by their subsidiaries. Acts 1962, No. 275, § 1."
The precise section of the Bank Holding Company Act which appellants contend is inapplicable to Whitney-Jefferson is Section 1003, the pertinent portion of which states:
"§ 1003. Prohibitions upon acquisition of bank shares or assets
(5) for any bank holding company or subsidiary thereof to open for business any bank not now opened for business, whether or not, a charter, permit, license or certificate to open for business has already been issued. Notwithstanding the foregoing, this prohibition shall not apply to additional shares acquired by a bank holding company in a bank in which such bank holding company owned or controlled a majority of the voting shares prior to such acquisition."
In the first instance appellants maintain Section 1003 is inapplicable to Whitney-Jefferson because said concern was at least "constructively" open for business on the effective date of the statute, therefore, to impose the terms of the statute upon appellant characterizes such application as an ex post facto law in violation of the state and federal constitutions. Alternatively, appellants contend that by virtue of the procedure hereinafter set forth it acquired vested rights and entered into valid and binding contracts which application of the statute would divest and impair contrary to the provisions of both the state and federal constitutions. Also, in the alternative, appellants maintain the statute deprives Whitney-Jefferson of property rights, prevents the opening of a properly chartered national bank, grants special privileges to competing banks in the form of the exclusive right to operate in Jefferson Parish and constitutes an arbitrary and capricious classification resulting in a denial of vested rights without due process of law.
It is readily conceded by all concerned that the present litigation emanates from the attempt of Whitney National Bank of New Orleans (Whitney-New Orleans), admittedly the largest bank in Louisiana and one of the largest in the south, to extend its sphere of operations from Orleans Parish (its domicile) into the neighboring Parish of Jefferson. The ingenious method by which Whitney-New Orleans sought to accomplish its proposed expansion resulted in protracted litigation between the parties in the federal courts before institution of the present action in the courts of this state. Narration of the background and history of the events, and circumstances which prompted the initial litigation in the federal courts and the chronological developments which ensued, though lengthy and detailed, are essential to a complete and clear understanding of the issues herein posed.
Appellant, Whitney-Holding, is a Louisiana business corporation which owns all the stock in Whitney-New Orleans, excepting director's qualifying shares. Although Whitney-New Orleans is not a nominal party to this litigation its relationship to appellants is a basic aspect of this and the antecedent federal actions between the litigants at bar. Whitney-Holding is a bank holding company as defined pursuant to the provisions of the Louisiana Bank Holding Company Act, more particularly LSA-R.S. 6:1002.
Plaintiff, Whitney-Jefferson, is also a banking association organized pursuant to the National Banking Laws, its domicile being in Jefferson Parish as the corporate name indicates. Although Whitney-Jefferson is apparently a legal entity with power to sue and be sued, the question whether it has the right to receive authority to operate and conduct a banking business is an issue in this suit.
Appearing herein as intervenors opposing the relief sought by appellants are The Bank of New Orleans and Trust Company (The Bank of New Orleans). The Bank of Louisiana in New Orleans (The Bank of Louisiana) and the Guaranty Bank and Trust Company of Lafayette, Louisiana (Guaranty Bank).
*434 Admittedly to meet the needs of the expanding economy in the rapidly growing portion of Jefferson Parish situated east of the Mississippi River and adjacent to the City of New Orleans, and counter the competition of a rival bank, National Bank of Commerce in New Orleans, which had opened an affiliate bank in Jefferson Parish bearing the name National Bank of Commerce in Jefferson Parish, Whitney-New Orleans sought to establish a banking connection in Jefferson Parish to be controlled by Whitney-New Orleans. The City of New Orleans being conterminous with the Parish of Orleans, Whitney-New Orleans could not open a branch in Jefferson Parish because of state and federal prohibitions contained in LSA-R.S. 6:54 and 12 U.S.C. § 36(c) whose design and purpose is to promote, encourage and protect development of local banks under local management with local capital and control. Although Whitney-New Orleans could legitimately extend its operation into Jefferson Parish by means of an affiliate bank, which plan of operation received approval in Camden Trust Company v. Gidney, 301 F.2d 521; it rejected the affiliated bank plan because that method made it impossible to retain and preserve identity of ownership and also because control of the affiliate could in time slip away from the parent corporation through stock transfers by sale or succession. In this regard Whitney-New Orleans was aware that the law prohibits common officers or directors serving affiliated banks when the stockholders of the parent bank no longer have control of the subsidiary.
Having rejected the affiliated bank plan because of the very features thereof which would exempt such an operation from application of the antibranch banking laws, Whitney-New Orleans devised an alternate method whereby it could establish a banking connection in neighboring Jefferson Parish over which its stockholders would maintain perpetual control and ownership. The scheme involved four basic steps as follows:
First: Whitney-New Orleans, using $350,000 of its own funds as capital, created Whitney-Holding and distributed the shares in Whitney-Holding to the stockholders of Whitney-New Orleans.
Second: With the funds provided by Whitney-New Orleans, Whitney-Holding created a new national bank known as Crescent City National Bank (Crescent City).
Third: Whitney-New Orleans, Whitney-Holding and Crescent City confected an agreement whereby Whitney-New Orleans was merged into Crescent City which latter bank then changed its name to Whitney-New Orleans. In this manner the creature, Whitney-Holding, became the parent of its creator, Whitney-New Orleans.
Finally, Whitney-New Orleans then provided the sum of $650,000 to its new parent, Whitney-Holding, for use in purchasing the entire stock issue of Whitney-Jefferson.
To bring its plan to fruition, it was necessary for Whitney-New Orleans to obtain approval of the Comptroller of the Currency of the United States (Comptroller) and the Board of Governors of the Federal Reserve System (Board of Governors). Whitney-Holding was organized July 20, 1961. On October 3, 1961, the Comptroller approved Whitney-New Orleans' proposed plan and thereafter, by letter dated October 11, 1961, recommended its approval by the Board of Governors.
On January 17, 1962, the Board of Governors held a public hearing with respect to the intended procedure and on May 3, 1962, issued the following order with respect thereto:

"ORDER APPROVING APPLICATION UNDER BANK HOLDING COMPANY ACT
There has come before the Board of Governors, pursuant to section 3(a) (1) *435 of the Bank Holding Company Act of 1956 (12 U.S.C. 1842) and section 222.4 (a) (1) of Federal Reserve Regulation Y (12 CFR 222.4(a) (1)), an application on behalf of Whitney Holding Corporation, New Orleans, Louisiana, for the Board's prior approval of action whereby Whitney Holding Corporation would become a bank holding company by acquiring substantially all of the voting stock of (1) the Crescent City National Bank, New Orleans, Louisiana, (a proposed new bank), into which would be consolidated the existing Whitney National Bank of New Orleans, under the latter title, and (2) the Whitney National Bank in Jefferson Parish, Jefferson Parish, Louisiana (a proposed new bank). A Notice of Receipt of Application was published in the Federal Register on July 28, 1961 (26 Federal Register 6792), which provided an opportunity for submission of comments and views regarding the proposed acquisitions, and the time for filing such comments and views has expired and all comments and views filed with the Board have been considered by it. Pursuant to Order published in the Federal Register on December 23, 1961 (26 Federal Register 12312), a public proceeding with respect to the application was held before the Board on January 17, 1962 to provide a further opportunity for the expression of views and opinions by interested persons.
It is Ordered, for the reasons set forth in the Board's Statement of this date, that said application be and hereby is granted, provided that the acquisitions approved herein shall not be consummated (a) sooner than seven calendar days after the date of this Order or (b) later than three months after said date, and provided further that Whitney National Bank in Jefferson Parish shall be opened for business within six months after said date."
Subsequently, on June 13, 1962, the Bank of New Orleans, Guaranty Bank and Merchants Trust & Savings Bank applied to the Board of Governors for a reconsideration of its May 3, 1962 order, simultaneously advising the Board of Governors of pending litigation (hereinafter discussed) against the Comptroller and of pending consideration by the Louisiana Legislature of the field of bank holding company operations. On June 21, 1962, J. W. Jeansonne, then State Bank Commissioner for the State of Louisiana, petitioned the Board of Governors for a re-hearing permitting him opportunity to be heard and voice opposition to the plan on the ground the scheme was an attempt to accomplish by indirection a method of operation prohibited by state and federal law, more particularly LSA-R.S. 6:54 and 12 U.S.C.A. § 36 (c) which proscribe interparish branch banking. With his request for re-hearing, the aforesaid Bank Commissioner forwarded to the Board of Governors an opinion of the Attorney General of Louisiana, characterizing the plan as an attempt to circumvent the state's branch banking laws.
The several petitions for reconsideration were rejected by the Board of Governors on June 25, 1962 on the grounds: (1) that the arguments were without substantial merit; (2) that "they relate largely to an alleged violation of provisions of the National Bank Act, which is administered by the Comptroller of the Currency, an official of the United States Treasury Department"; and (3) that the petitioners had ample opportunity to be heard during pendency of the proceedings and had failed to make any presentation until the proceedings had been terminated, the Board's order had been issued and most of the steps of the reorganization plan had been completed. The Board made no mention of pending litigation against the Comptroller and neither did it allude to the possible effect of pending legislation upon appellants' proposal. Notwithstanding its rejection of all applications for re-hearing, the Board of Governors suggested the following:
"As you are aware, section 9 of the Bank Holding Company Act (12 U.S.C. 1848) relates to judicial review of orders *436 of the Board of Governors under that Act. Section 9 confers a right to such review on `Any party aggrieved by an order of the Board under this Act'. In the event your clients should seek judicial review of the Board's Order in the Whitney matter, the question whether they fall within the quoted description and therefore are entitled to a judicial review is, of course, a question for determination by the United States Court of Appeals having jurisdiction."
Pursuant to the foregoing suggestion of the Board of Governors, and in accordance with Section 9 of the Federal Bank Holding Company Act (12 U.S.C.A. § 1848) on June 30, 1962, the Bank of New Orleans and Guaranty Bank filed a petition for judicial review of the Board's order in the Fifth Circuit Court of Appeals, in which the State Bank Commissioner intervened as a plaintiff.
Meanwhile, the Comptroller having signified his intention to issue Whitney-Jefferson a certificate of authority to open for business, the Bank of New Orleans, Merchants Trust, and Guaranty Bank filed an action on June 9, 1962, in the United States District Court for the District of Columbia against the Comptroller seeking a declaratory judgment coupled with an injunction to prevent the Comptroller's alleged unlawful issuance of a certificate of authority to Whitney-Jefferson. In substance the complaint charged Whitney-Jefferson was in reality a prohibited branch of Whitney-New Orleans and the issuance to it of a certificate of authority would contravene State and Federal laws prohibiting branch banking in neighboring parishes, more particularly LSA-R.S. 6:54 and 12 U.S.C. 36 (c) which provide as follows:
"§ 54. Branch offices other than in parish of domicile; capital required
All banks, savings banks, and trust companies having a capital of one hundred thousand dollars or more may open and maintain a branch office or branch offices in parishes in which there are no state banks, savings banks, and trust companies.
Not more than one branch office shall be opened in any one parish other than the parish of domicile, and such branch office shall be included in the number of branch offices authorized by Chapters 3 and 4 of this Title. The branch offices may carry on and conduct all usual transactions authorized by this Title for branch offices.
No branch office shall be opened without a certificate of authority from the commissioner."
Title 12 U.S.C. § 36:
"Branch banks
The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:

* * * * * *
(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. * * *"
Prior to institution of suit against the Comptroller in the United States District Court for the District of Columbia on June 9, 1962, the Comptroller agreed not to issue the necessary certificate of authority. Later, however, he announced he would *437 issue the certificate unless restrained from so doing by the Court. This development prompted plaintiffs in the suit to obtain a temporary restraining order against the Comptroller which issued June 27, 1962. Whitney-Jefferson intervened in the District of Columbia action as defendant and the Commissioner and Bank of Louisiana intervened therein as plaintiffs.
While the foregoing legal maneuvering was in progress, a bill prohibiting bank holding companies and their subsidiaries from doing business within the State of Louisiana was introduced in the Louisiana Legislature on June 3, 1962. In due course the bill proceeded to final passage in both houses of the legislature, and having been declared emergency legislation by the Governor of Louisiana, became effective as law, Act 275 of 1962, LSA-R.S. 6:1001-6:1006, immediately upon the Governor affixing his signature thereto on July 10, 1962. (See Louisiana Constitution, Article 3, Section 27.)
Applicability of the new statute to Whitney-Jefferson was urged by the plaintiffs in the District of Columbia action which contention was opposed by Whitney-Jefferson and the Comptroller who argued its inapplicability and alternatively, its unconstitutionality. All parties moved for summary judgment and the District of Columbia court on December 5, 1962, granted the motions of plaintiffs and intervening plaintiff, reaching the following legal conclusions (See Bank of New Orleans and Trust Company, et al. v. James J. Saxon, D.C., 211 F.Supp. 576):

"CONCLUSIONS OF LAW
1. The Court has jurisdiction over this action under 28 U.S.C. § 1331, and under the provisions of Sections 11-305, 306 of the District of Columbia Code, and is empowered to render a declaratory judgment herein under the provisions of 28 U.S.C. § 2201.
2. Defendant Comptroller of the Currency has no discretion to issue a Certificate of Authority to a national banking association to commence a banking business in a manner prohibited by law (Commercial State Bank of Roseville v. Gidney, 174 F.Supp. 770, 778, affd. [108 U.S.App.D.C. 278], 278 F.2d 871 (1960); Camden Trust Co. v. Gidney [112 U.S. App.D.C. 197], 301 F.2d 521, cert. denied 369 U.S. 886 [82 S.Ct. 1158, 8 L.Ed.2d 287] (1962); Wayne Oakland Bank v. Gidney [National Bank of Detroit v. Wayne Oakland Bank], 252 F.2d 537 (C. C.A. 6), cert. denied 358 U.S. 830, 79 S. Ct. 50, 3 L.Ed.2d 69 (1958)).
3. The Federal Bank Holding Company Act, at 12 U.S.C. § 1846, reserved to the States such powers and jurisdictions as they had or might exercise in the future with respect to banks, bank holding companies and subsidiaries of bank holding companies, and Section 3 (5) of Louisiana Act 275 of 1962 was enacted pursuant to and within the scope of the said powers and jurisdiction so reserved to the States by Congress, and said statute is constitutional (Braeburn Securities Corp. v. Smith, 15 Ill.2d 55, 153 N.E.2d 806, appeal dismissed for want of a substantial Federal question, 359 U.S. 311 (1959); Opinion of the Justices [102 N.H. 106], 151 A.2d 236 (N.H. 1959); also 12 U.S.C. § 1842(d), Federal Bank Holding Company Act).
4. Act 275 of 1962 is directly applicable to intervening defendant, Whitney National Bank in Jefferson Parish, a wholly owned subsidiary of a Louisiana-incorporated bank holding company, and said statute makes it unlawful for said intervening defendant to commence the business of banking in Louisiana. Accordingly, defendant Comptroller of the Currency should be permanently enjoined and restrained from issuing a Certificate of Authority licensing Whitney-Jefferson to commence such unlawful operations (Commercial State Bank v. Gidney, supra; Wayne Oakland Bank v. Gidney, supra [National Bank of Detroit v. Wayne Oakland Bank]).

*438 5. Plaintiff and intervening plaintiff banks, faced with proposed invasion of property rights and injury from the proposed unlawful issuance by defendant Comptroller of a Certificate of Authority to intervening defendant Whitney-Jefferson, have standing to bring this suit, and they have no other adequate remedy at law (Wisconsin Bankers Association v. Robertson, 190 F.Supp. 90, 94, affd. [111 U.S.App.D.C. 85], 294 F.2d 714 (App. D.C.), cert denied 368 U.S. 938 [82 S. Ct. 381, 7 L.Ed.2d 338], rehearing denied 368 U.S. 979 (1961); Commercial State Bank v. Gidney, supra; Wayne Oakland Bank v. Gidney, supra [National Bank of Detroit v. Wayne Oakland Bank]).
6. The Court, having upheld the constitutionality of Louisiana Act 275 of 1962 in its application to intervening defendant making it unlawful for said defendant to open for business in Louisiana, it is unnecessary for the Court to address itself to the other contentions of the parties on the question of the applicability of 12 U.S.C. 36(c), and as to whether, by its terms, it proscribes in these circumstances, the setting up of the type of bank here involved, and secondly, if not proscribed by the terms of the statute, whether this Court ought to look behind the corporate form of Whitney-Jefferson to determine whether or not it is in violation of Section 36(c)."
It is clear from the above quotation that the District Court for the District of Columbia rejected appellant's proposed reorganization plan on the ground it contravened the statute the application of which plaintiffs herein seek to avoid.
From the adverse decision of the District Court for the District of Columbia, Whitney-Jefferson and the Comptroller took separate appeals to the United States Court of Appeals for the District of Columbia, which latter tribunal affirmed the decision of the former on August 14, 1963, holding inter alia, as follows (See Whitney National Bank in Jefferson Parish v. Bank of New Orleans and Trust Company, 116 U.S.App.D.C. 285, 323 F.2d 290):
"Since Whitney-Jefferson clearly is not an affiliate, the question is whether the elaborate and ingenious scheme of reorganization devised by Whitney-New Orleans results in what is in reality the establishment of a branch of Whitney-New Orleans in east Jefferson Parish, in violation of federal law.
There was actually no pretense about the matter: Whitney of New Orleans frankly proposed to evade the statutes by establishing through the holding company arrangement an office in east Jefferson Parish which it would manage and control."
The Court of Appeals further noted that the Board of Governors and the Comptroller were cognizant of the true nature of the proposed banking arrangement but deferred to the Comptroller whose duty it is to enforce the National Bank Act. In addition the Court also observed that the Comptroller was aware, when he approved the suggested procedure, that its purpose was to evade federal and state statutes forbidding branch banking in Louisiana beyond parish lines. The court also found that the case of First Nat. Bank in Billings v. First Bank Stock Corp., 9 Cir., 306 F.2d 937, was distinguished from the instant matter but acquiesced in the holding of the cited authority to the effect that the corporate veil should be penetrated when one banking institution does business through the instrumentality of another as if the organizations were a single unit. The court further held the unitary type operation contemplated by appellants embraces all of the primary characteristics of branch banking. Distinguishing the affiliate bank plan (which permits allied banks to operate in different parishes) which method of operation was approved in Camden Trust Company v. Gidney, 112 U.S.App.D.C. 197, 301 F.2d 521, cert. denied 369 U.S. 886, 82 S.Ct. 1158, 8 L.Ed.2d 287, the Court of Appeals pointed out that the new holding company *439 (Whitney-Holding) was not providing its subsidiary with new and fresh capital, as would be the case in the affiliate bank relationship, but rather Whitney-New Orleans was to supply the necessary capital. Regarding the several corporate entities involved, the Court rendered the following enlightening observations:
"Consequently, we pierce the corporate veil which shrouds this intricate transaction, and see Whitney-New Orleans attempting to establish a branch in Jefferson Parish in violation of 12 U.S.C. § 36(c). It is a bootstrap operation by which Whitney-New Orleans, using its own funds in corporate maneuvering, seeks to establish a branch in prohibited territory. Like Jacob of old, Whitney-New Orleans covered its hands with the Esau-like plan of reorganization and, despite the telltale sound of its own voice, obtained the blessing of the Comptroller of the Currency. Unlike Isaac, however, the Comptroller was not gulled by the ruse; acting ultra vires in the circumstances shown, he knowingly permitted it because he considered the end desirable, and because he thought the corporate maneuvering impervious to attack. But, when the corporate veil is pierced, it becomes apparent that both voice and hands were those of Whitney-New Orleans."
The United States Supreme Court granted certiorari, 376 U.S. 948, 84 S.Ct. 967, 11 L.Ed.2d 969 to review the decision of the Court of Appeals and recognized that the purpose of the reorganization plan was "to avoid the restrictions of the national banking laws as to branch banking and still tap the banking market in Jefferson Parish." In its decision, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed. 2d 386, the Supreme Court rejected the conclusion of the Board of Governors that the Comptroller alone possessed responsibility and authority with regard to the National Bank laws stating: "Clearly, if respondents' argument that Whitney-Jefferson would be a branch bank were sound, the Board would be compelled to disapprove the arrangement. For a plan of organization violative of federal law would hardly be consistent with the statutory command that no bank holding company should be expanded beyond the limits consistent with the public interest." (Emphasis by the Court). The Supreme Court also stated, "Again, the Board could not approve a holding company arrangement involving the organization and opening of a new bank if the opening of the bank, by reason of its ownership by a bank holding company would be prohibited by a valid state law." After reviewing the Bank Holding Company Act in the light of its legislative history, the Supreme Court concluded Congress thereby intended that the Board of Governors should have exclusive original jurisdiction to determine the propriety of such a plan of reorganization, subject to review only by the Courts of Appeal. On this premise the Supreme Court found that the United States District Court for the District of Columbia had no jurisdiction to adjudicate the merits of the intended holding company arrangement.
Noting that the appeal from the approval of the Board of Governors was still pending in the Fifth Circuit Court of Appeals, the Supreme Court pointed out that should the Comptroller issue the desired certificate of authority to Whitney-Jefferson, his action in this respect would be completely negated should the approval of the Board of Governors be reversed.
The Supreme Court then reversed the judgment of the Court of Appeals for the District of Columbia and remanded the matter to the latter tribunal with instructions to dismiss. The dismissal of the Supreme Court was coupled with the suggestion that the Board of Governors be provided opportunity to determine the applicability and effect of the new Louisiana Statute and the concurrent issuance of a 60-day stay order to enable the parties to obtain a remand to the Board of Governors from the Fifth Circuit Court of Appeal.
The remand suggested by the Supreme Court was ordered March 1, 1965. Nevertheless, *440 on May 4, 1965, petitioners herein filed the present suit for declaratory judgment in the Nineteenth Judicial District Court for the Parish of East Baton Rouge against the present Commissioner.
On July 23, 1965, the Board of Governors provided an opportunity for the parties to submit briefs on the following issues:
"(1) Would consummation of Applicant's plan to become a bank holding company result in Whitney National Bank in Jefferson Parish becoming a branch of Whitney National Bank of New Orleans in violation of section 5155 of the U.S. Revised Statutes (12 U.S.C. 36)?
(2) Do the terms of Louisiana Act No. 275 of 1962 (La.Stat.Ann. tit. 6, §§ 1001-1006 prohibit consummation of Applicant's plan?
(3) If Act No. 274 were construed to prohibit consummation of Applicant's plan, would said Act contravene any provision of the Constitution or statutes of the United States?
(4) Should the Board postpone making its decision upon reconsideration until termination of the pending suit in the Nineteenth Judicial District Court of Louisiana (Whitney National Bank in Jefferson Parish et al. v. James, State Bank Commissioner, No. 106682, filed May 4, 1965)
(a) in the event question (1) is answered by the Board in the negative?
(b) regardless of the Board's conclusion as to question (1)?"
The case was heard in the Nineteenth Judicial District Court and judgment rendered therein on October 19, 1965, from which the present appeal was perfected December 22, 1965.
On January 24, 1966, the Board of Governors ordered a continuance of the proceedings before it pending final decision in this suit, reserving applicants' right to renew their request for oral argument after final decision in this action or should circumstances otherwise warrant. The Board of Governors also gave notice that in the event new circumstances arose, it might reconsider whether further postponement of action on its part would be in order in the public interest.
We note that some of the issues raised by appellants are related, and the constitutional questions presented are based on similar principles of law. To avoid unnecessary repetition, we have grouped all such issues, constitutional questions and alleged specifications of error into categories which we believe present the substance of the numerous positions taken by plaintiffs, as will hereinafter appear.
Appellants maintain LSA-R.S. 6:1003(5) cannot be applied to national banks without violating the supremacy clause (clause 2) of Article VI of the United States Constitution, and in support thereof cite numerous cases to the effect that states may not adopt laws to regulate or interfere with the operation of national banks. However, the supremacy clause relied upon by appellants is not contravened in those spheres wherein Congress reserves the authority of the States to act. For example, as herein previously noted, the National Bank Act expressly defers to state laws imposing territorial limitations upon branch banking, the validity of which restriction was recognized by the United States Supreme Court in the case involving the parties presently before us and arising from the same controversy. The right of the several states to control branch banking has likewise been consistently upheld in numerous decisions by the Federal Courts. In manifold respects, including branch banking, Congress has provided that state laws shall apply equally to state and national banks. See United States v. Philadelphia Nat. Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915.
*441 With respect to the authority of the states to legislate concerning the affairs and operation of bank holding companies, insofar as such regulation affects national banks, we note that the United States Bank Holding Company Act of 1956, (12 U.S.C.A. § 1846), provides as follows:
"§ 1846. Reservation of rights to States
The enactment by the Congress of this chapter shall not be construed as preventing any State from exercising such powers and jurisdiction which it now has or may hereafter have with respect to banks, bank holding companies, and subsidiaries thereof. May 9, 1956, c. 240, § 7, 70 Stat. 138."
Appellants argue that the foregoing authority does not confer upon the State of Louisiana any new power to regulate the opening of national banks, but merely reserves to the state such authority in the field as that state enjoyed prior to the statute's enactment. It must be noted that the applicable Louisiana statute does not purport to regulate the opening of national banks, as such, any more than the state anti-branching law claims to do. Its clear import, inter alia, is prevention of formation of new bank holding companies or "the acquisition of control by whatever means of additional banking institutions by existing bank holding companies and by their subsidiaries." Even a casual reading of the statute discloses its equal application to both state and national banks without differentiation or distinction. That state laws regulating bank holding companies and their subsidiaries validly apply to national banks without violating the supremacy clause of the United States Constitution has been held in other state jurisdictions. Opinion of the Justices of New Hampshire, 102 N.H. 106, 151 A.2d 236; Braeburn Securities Corp. v. Smith, 15 Ill.2d 55, 153 N.E.2d 806; also by the United States District Court for the District of Columbia in Bank of New Orleans and Trust Company v. Saxon, 211 F.Supp. 576 (reversed on jurisdictional grounds). In Braeburn Securities Corp. v. Smith, supra, the supremacy clause issue was raised in the same manner as in the present case and rejected by the Supreme Court of Illinois. The United States Supreme Court granted a motion to dismiss the appeal from the decision in the Illinois case, supra, in a memorandum decision which stated: "Per Curiam: The motion to dismiss is granted and the appeal dismissed for want of a substantial federal question." 359 U.S. 311, 79 S.Ct. 876, 3 L.Ed.2d 831. Dismissal on the ground that the Constitutional question raised is not substantial is even stronger action than affirmance. Milheim v. Moffat Tunnel Improvement Dist., 262 U.S. 710, 43 S.Ct. 694, 67 L.Ed. 1194.
We are in complete accord with the cited authorities and conclude that LSA-R.S. 6:1003(5) does not violate the supremacy provision of the United States constitution relied upon by appellants.
Appellants next contend that application of the state statute in question violates Article 4, Section 15 of the Louisiana Constitution and Article I, Section 10 of the United States Constitution because its operation with respect to Whitney-Jefferson characterizes the statute as an ex post facto law as well as one which impairs contractual obligations and dispossesses Whitney-Jefferson of vested rights. In this regard it is argued that the chartering of a national bank constitutes a contract between the federal government and the bank giving rise to vested interests which the state cannot impair. It is further contended that on the effective date of the offending statute, Whitney-Jefferson was constructively open inasmuch as it had complied with all federal regulations and there remained only the formality of issuance by the Comptroller of the necessary certificate of authority which event was precluded by injunction of a court having no jurisdiction in the matter.
On its face, appellants' aforesaid argument appears sound but analysis reveals its *442 failure to consider certain pertinent and vital principles. First, the fact that a certificate of authority must be granted though not necessarily delivered, as a prerequisite to the proposed bank's commencement of business indicates that petitioners had not yet acquired the vested rights claimed. While it is true the injunction which prevented issuance of the certificate was ordered by a court without jurisdiction, the United States Supreme Court has clearly indicated that upon application to the proper court (the Court of Appeals for the Fifth Circuit) the injunction, if necessary, would properly issue. Moreover, the Supreme Court went even further and suggested that reversal of the approval of the Board of Governors by the Fifth Circuit Court would nullify such a certificate if issued.
The foregoing leads to consideration of the next principle which negates appellants' acquisition of allegedly vested rights under the circumstances, namely, the fact that the Comptroller intended to issue the certificate of authority notwithstanding the proposed reorganization scheme was simply a means of circumventing state and federal laws regulating branch banking. On this most important issue, we are in complete accord with the reasoning of the United States Court of Appeals for the District of Columbia Circuit as expressed in Whitney National Bank in Jefferson Parish v. Bank of New Orleans and Trust Company, 116 U.S.App. D.C. 285, 323 F.2d 290, the pertinent portions of which are hereinabove cited. Manifestly, petitioners cannot accomplish by indirection that which by direct means is expressly prohibited by state and federal law. Vested rights cannot emanate from unlawful and unauthorized acts of public officers.
Our jurisprudence is settled to the effect that a contract based on an unconstitutional statute is void and creates no obligations to be impaired by subsequent legislation. Flournoy v. First Nat. Bank of Shreveport, 197 La. 1067, 3 So.2d 244. Also germane to the issue under consideration is the following which we cite with approval from 16 Am.Jur.2d Verbo Constitutional Law, page 786, § 439:
"Since the obligations which the Constitution of the United States protects from impairment are such as exist by reason of contract, it follows that as a basis for invoking the rule there must be a valid contract possessing the essential element of assent. The Federal Constitution does not protect contracts which are invalid, illegal, or nudum pactum. That which is not an enforceable contract right is not an obligation which can be impaired within the meaning of the constitutional prohibition."
Regarding the contention that petitioners acquired vested rights from the order of the Board of Governors dated May 3, 1962, we note that the Supreme Court specifically recognized that the Louisiana act became effective July 10, 1962, "at which time the Board's approval was not final, being on review in the Court of Appeals for the Fifth Circuit * * *." Furthermore, the Board of Governors failed to consider the possibility that the proposed reorganization might violate state and federal branch banking laws under the misapprehension that such questions were the sole responsibility of the Comptroller. In this respect we have previously shown herein that the Supreme Court has indicated the Board of Governors could not approve a plan violative of state and federal laws because such approval in the language of the Supreme Court "would hardly be consistent with the statutory command that no bank holding company should be expanded beyond the limits consistent with the public interest." We hold, therefore, petitioners acquired no vested rights pursuant to the order of May 3, 1962, which could relieve Whitney-Jefferson of the effect of LSA-R.S. 6:1003.
*443 The argument that the statute is void as an ex post facto law if applied to appellant Whitney-Jefferson, is without legal foundation. First, it has been shown hereinabove that Whitney-Jefferson was not constructively open on the effective date of the act as contended by appellants. Secondly, assuming arguendo, Whitney-Jefferson was constructively in business at the crucial time, it is clear beyond all doubt that its authorization was illegal and its operation contrary to Louisiana's then effective branch banking law. An enterprise operating without legal sanction may not invoke the protection of the ex post facto clause of the Federal Constitution to perpetuate its continued unlawful existence.
We find a total lack of merit in appellants' contention that the statute in question confers special privileges upon banks already operating in Jefferson Parish, contrary to Article 4, Section 4 of the Louisiana Constitution, and particularly so with respect to the National Bank of Commerce in Jefferson Parish which is admittedly an affiliate of National Bank of Commerce. The statute does not prohibit an affiliate relationship between banks in different parishes because an affiliated bank is neither a holding company subsidiary nor a branch bank. See Camden Trust Co. v. Gidney, 112 U.S.App.D.C. 197, 301 F.2d 521. Whitney-New Orleans has available to it the same lawful plan of operation as that followed by National Bank of Commerce. There is nothing to prevent Whitney-New Orleans from operating an affiliated banking house in Jefferson Parish save only its insistence in adhering to the principle of perpetual unitary control which it considers indispensable to protect its integrity and which, incidentally, characterizes its proposed method of operation as an effort to open a branch bank. The converse of the proposition is of course true. Should National Bank of Commerce, or any other banking institution, attempt to establish a bank in Jefferson Parish as a subsidiary of a bank holding company, it would be in the same identical position as Whitney-New Orleans now finds itself. The law governing bank holding companies applies equally to all without discrimination and confers no special privileges to any particular institution or institutions.
Appellants' contention that Whitney-Jefferson should not be prohibited from opening a bank in Jefferson Parish, because other organizations have been granted the privilege, is amply answered by the ruling in State ex rel. Schwegmann Bank and Trust Co. v. Jeansonne, La.App., 144 So.2d 159, which in effect held that it is discretionary with the Commissioner under our state banking laws to issue a license and also that under the law the Commissioner may not issue a license unless an economic need has been demonstrated therefor and further that his finding of the nonexistence of an economic need will not be set aside unless his determination in this respect is shown to be arbitrary and unreasonable. In the present case there has been no showing that the Commissioner acted arbitrarily or capriciously. Rather it would appear that for the Commissioner to sanction the opening of a bank under the circumstances proposed by appellants would be tantamount to placing his stamp of approval upon an illegal procedure.
We come now to petitioners' alternative prayer for a remand for the introduction of evidence relative to the alleged private and political motives attending introduction and lobbying of the bill to final passage as an act of the legislature, which evidence the trial court declined to admit. Presumably the motives of the Governor in certifying the emergency nature of the measure are also to be explored. In this regard an incidental issue is likewise raised by petitioners' claim the applicable subsection of the statute was added as a floor amendment to the original bill. A similar contention was recently made in the case of In re Buquet, La.App., 184 So.2d 288, 293, certiorari denied 186 So.2d 159, May 19, *444 1966, wherein we held that "a provision incorporated into a legislative act whether by inclusion in the bill as initially introduced, or added by amendment subsequently during the legislative process must be accorded the same dignity. The legislative will, expressed in the enrolled bill incorporating all amendments thereto, signed by the presiding officers of both Houses of the Legislature and promulgated as law with or without the Governor's approval, must be construed as one law whose various provisions possess equal authority and force."
In support of the contention that the purpose, reason and spirit of the act as well as the cause or causes which motivated its enactment should be considered by the courts in determining its true meaning, and the further contention that in determining whether legislation goes beyond the state's police power, the courts may look into the circumstances under which it was enacted, the necessity for such a law, and the benefit to be accomplished, or the evil to be suppressed, appellants cite State v. Blake, 170 La. 175, 127 So. 592, and Radford v. Louisiana Central Lumber Co., 15 La.App. 476, 131 So. 765.
We have carefully considered the cited authorities and find they do not, as argued by appellants, authorize the courts to inquire into the legislative history and circumstances accompanying enactment of a law except to determine legislative intent where such intent is not clearly expressed in the statute itself, or to determine whether a statute passed pursuant to the police powers of the state is reasonably related to the benefits sought to be accomplished or the evil intended to be suppressed. In this regard we cite with approval the following language appearing in State on Relation of Fonseca v. McCulloch, La.App., 126 So.2d 191:
"* * * It is only when the law is ambiguous, or subject to two interpretations, that the intention of the Legislature, or the history of the law involved, may be inquired into by a court for the purpose of determining legislative intent. Where the law is clear and unambiguous in its literal terms, the letter is not to be disregarded under the pretext of pursuing its spirit. LSA-C.C. Art. 13."
The courts of this state have long since recognized the limitations upon their power to interpret legislative measures. The rule is well and succinctly stated in the following quotation from the Third District Land Company v. Toka, La.App., 170 So. 793:
"`The intention of the legislature to which effect must be given is that expressed in the statute, and the court will not inquire into the motives which influenced the legislature, or individual members, in voting for its passage; nor indeed as to the intention of the draftsman, or of the legislature, so far as it has not been expressed in the act. So, in ascertaining the meaning of a statute, the court will not be governed or influenced by the views or opinions of any or all of the members of the legislature or its legislative committees, or of any other persons.' Corpus Juris, Verbo Statutes, vol. 59, p. 1017."
The rule of interpretation above noted is based on the statutory authority contained in LSA-R.C.C. Articles 18 and 20, which state:
"Art. 18. Reason and spirit of laws
Art. 18. The universal and most effectual way of discovering the true meaning of a law, when its expressions are dubious, is by considering the reason and spirit of it, or the cause which induced the Legislature to enact it."
"Art. 20. Odious and favored laws
Art. 20. The distinction of laws into odious laws and laws entitled to favor, with a view of narrowing or extending *445 their construction, can not be made by those whose duty it is to interpret them."
Section 1001 of the statute in question in clear and unmistakable language announces the intent of the legislature to foster and protect the growth of the independent unit bank as an institution of local origin and ownership, whose activities are tied in with local economic and social affairs, to accomplish the dual purpose of preventing undesirable centralization and concentration of control in the field of banking and to insure effective competition among all banking institutions. It has deemed formation of new bank holding corporations and the acquisition of control, by whatever means, of additional banking institutions by existing bank holding corporations contrary to the clearly expressed purpose of the act. (Emphasis supplied by the Court.)
We find the scope of the statute well within the police power of the state and also find the means employed to achieve the desired end to be reasonably calculated to produce the result sought. We find nothing discriminatory or arbitrary in the statute's provisions. Its application is to all alike without favoritism or partiality.
It is worthy of note that the Congress of the United States has provided for the preservation, continuance and protection of the dual banking system prevailing in this nation by expressly permitting application of some aspects of state legislation to national banks as well as state banks to insure fair competition and the continued existence of state banks which might otherwise be imperiled. We find nothing in the applicable statute repugnant to either the Constitution and laws of the United States or the Constitution of the State of Louisiana, and also hold it applicable to petitioners herein.
Accordingly, the judgment of the trial court is affirmed, costs to be paid by appellants.
Affirmed.
NOTES
[*] Due to the death of ELLIS, J., prior to rendition, this opinion is unanimously rendered by LOTTINGER, LANDRY, REID and BAILES, JJ.